against Oneida County. Mr. Kinney. Thank you, Your Honor. May it please the Court opposing counsel. There are really three issues that I'll overview before I get into my argument here. The first one pertains to the Minnell claim. Does a widespread practice that allows inmates to hide behind obstructions in their cells make suicide attempts behind those obstructions almost inevitable? The answer to that has to be yes. Jail officials cannot prevent a suicide attempt that they cannot see, and they can't prevent a suicide attempt if inmates believe that the inmate can't be seen. It encourages inmates to engage. On your Minnell claim, you have to show that they were deliberately indifferent to a known risk that the policy would cause a constitutional violation, and there has never been a suicide at this jail before. How do you get around that? Your Honor, the jurisprudence from this circuit says jails don't get a one free suicide pass, and that applies here. It simply is beyond the ability to comprehend that if the jail is going to allow inmates to hang obstructions on their cells to hide them from the view of the jailers, that that does not create a risk of suicide attempts, because one of the things that someone who tries to commit suicide wants to do, they have to do, is to hide. I understand why you're starting with Monell. County liability would be possibly where a recovery is at here. I get that, but this is a lot different than what our court encountered in Woodward and in JKJ versus Polk County. Your Monell claim may have traction if you had some kind of pattern in practice. Suicide or attempted suicide or self-harm or something like that that was manifesting itself with inmates using bed sheets to shield themselves from view. That's just not in this record, unfortunately, for you. It's the reality of what the record is. I encourage the court to look at the 11th Circuit case which I cited in the brief, Rogers versus Sheriff of Santa Cruz. A similar issue was at play. There were curtains that the jail allowed inmates to hang up, and the 11th Circuit found that the plaintiff in that case did state a Monell claim because... Here, though, your claim is an inconsistent enforcement of this policy. There's no policy that allows curtains or bed sheets or shields or anything like that to be hung. In fact, it's prohibited. Your point is the Monell violation is arising out of inconsistent enforcement of that. Or, stated alternatively, a well-established practice that inmates were allowed to hang coverings over their cell doors so they couldn't be seen. And there's evidence in the record to support that. Another issue in the case is, and I'm just going to take the bull by the horns here, because there are, I'm going to admit it, lots of cases that say strange behavior by itself is not an indication of suicidality. But it is notice of a serious mental health illness that demands treatment. Moreover, in this case, there's more than just strange behavior issue. This isn't somebody just hearing voices or talking to themselves. This case also involved known facts that Gavin Womow had stricken himself. He hid himself. The jail's own rules recognize that prompt medical exam is necessary, along with follow-up questions from jail officials. When someone is... How do you get around our opinions in Jump and Pulera? And in, I think it was Jump where it was known that he was throwing himself against the cell, and that still wasn't sufficient. Your Honor, in the Jump case, one enormous difference in the Jump case is that the plaintiff in Jump actually got medical care. The defendants in that case made sure that in reaction to him jumping against the cell doors that he was able to be seen by a health care professional. Another issue is that in the Jump case, the custodial agent was the same party that observed the behavior, so they could exercise judgment. In this case, the custodial agent is not the entity that observed the behavior. It was Agent Bunce, and there was absolutely no effort to find out any of the details behind what actually she meant by strange behavior, or talking of demonic things, or striking himself. In other words, they put their head in the sand and refused to discover facts that would have either confirmed or ruled out the extent of Gavin Womow's... Put the head in the sand is a pretty... I know why you're using that phrase, but it's a pretty aggressive interpretation of the fact pattern, right? Because what Mr. Womow said to Bunce, you're 100% right, is very troubling. This is a man, there's no doubt he's suffering from serious mental illness. But that conversation led to multiple follow-up conversations. Officer Randolph, for example, then got in touch with Sergeant, I'm not sure how to pronounce it, Holinsky, etc., and it led to this notation in the log, this thing that you all are calling the muster, and all that. So it's not ignoring Probation Officer Bunce's call. They could have done more. I think you make a fair point on that, but I don't know that you can say they just totally ignored it and put their head in the sand. Your Honor, in some respects, because they didn't know the full extent of what happened, in that respect they did refuse to confirm facts or get clarification, just like the defendants did in Velez. But with respect to the information... But don't you think their reaction was indicative of, we have a troubled inmate, he's talking about demons, you know, we need to keep an eye on him. Let's keep an eye on him. Get that in the log. Well, that's what they did. Sure. And then they made sure the officers who did observe him knew that, that they should keep an eye on him. Two things with respect to that. First of all, there's support in the record that Officer Rudolph did not convey a very important part of the information that Probation Agent Bunce shared with her. That she did not share the fact that he was hitting himself, either with Holinsky... But she did share the fact that he had made demonic statements. Yes. And other troubling statements. I think there's an issue of fact on whether or not she shared the hitting, but I understand we're at summary judgment. And the conduct that would have been objectively reasonable would have been to do what they would have done in booking when they learned of this when he was in general population. Which would have been to get a prompt medical attention and to keep him in observation until he had gotten that attention. Because they knew what they didn't know. They're not health care providers. They know somebody. They're hearing from a third party source, a probation agent who thinks it's bad enough that she needs to call the jail. They know what they don't know. I know you want to save some time for rebuttal. One of the things that would help me to hear your reaction to is he unfortunately took his life on January 8th, correct? At night. But there were a lot of observations of him that occurred between the course observations. I mean your point is he should have been on a suicide watch. I get that. But there had been a lot of officers see him. See him on a video screen. See him when they were doing rounds, etc. And the mental illness was not manifesting itself in those observations in a way that resulted in any action. And there doesn't seem to be an argument that what do you mean? The video shows he was constantly hitting himself or doing this or that. What's your response to that? Sure. The fact that Gavin Womow was presenting in a perfectly normal fashion at booking. No, no, no. Between the 6th and the 8th. I understand. Yes, Your Honor. I'm trying to get there. And that he was acting perfectly normal after his encounter with Ms. Bunce should have had the exact opposite impression. Say, well, this is unusual. You've got somebody who's hitting himself, who's talking of demonic things, who's acting strangely, and that it's bad enough that this probation agent thinks that she should call us, but that's completely inconsistent with his behaviors that we've seen. That should have prompted more investigation, not the meaningless keep an eye on him, which was the exact same standard that applied to every inmate in the jail. I will reserve the rest of my time for rebuttal. Thank you. Certainly, Counsel. Ms. Mills. Good morning, Your Honors. May it please the Court. I think or at least hope we can all agree that corrections officers have what is objectively one of the most thankless and stressful jobs in our society, but it is one that we very much require to keep our society functioning. They get training. They have experience seeing people acting in ways that we could not even imagine. And I know that the Court has already recognized it, but just as it has said multiple times, abnormal behavior is common in jails. And so for a corrections officer, if you were to ask them, they would wholeheartedly agree. It is extremely commonplace for inmates to act in unusual ways that people outside in the free world would think is absolutely beyond the pale, but when you're incarcerated it's kind of par for the course. They have to use their training. They have to use their experience to try to differentiate. And again, they're not trained health care providers, but they do get some training. They have to try to differentiate and parse out what is indicative of a serious, substantial risk of self-harm and what is, for lack of a better word, garden variety weirdness. I think it's very important, and Judge Scudder, you pointed out that this call that Agent Bunce made to the jail occurred on June 6th. Two full days went by until he committed suicide. In those days, the record is clear that he was observed 37 to 40, or I think it's 39 to 44 times every single day by many multiple people, not just the people who are named as defendants in this case. He did not do a single thing, say a single thing, act in any way that any of them thought was even the slightest bit unusual. There was nothing that would have tipped them off that what Agent Bunce was reporting could be corroborated by what they were seeing. The day of, he had the COVID testing and one of the officers, was it a medical personnel or was it just one of the regular officers who was able to observe him and who was trained in noticing mental distress? Officer Turkowitz went to his cell with Nurse Wilhelm. They were in his cell together. This was four hours prior to him committing suicide. And the nurse was trained in recognizing mental health troubling signs. That's correct. She testified she gets twice yearly training and updates. They were in his cell for enough time to perform the COVID test. Both of them testified that there was nothing unusual about his demeanor and in fact, Officer Turkowitz said that when he told Mr. Wallnau that he would be able to go to general population if he tested negative, Mr. Wallnau seemed pretty pleased by that. There was absolutely nothing in this very close proximity face-to-face longer than just a glance at the cell during usual checks that would have suggested that anything was wrong. That was the evening of I just want to make sure I got the timing right. That was the evening of July 6th. July 8th. I'm sorry, July 8th, correct. About four hours before? About four hours prior to when he was discovered. Okay. I think it's also important to note, in just touching on this cell covering issue, I've handled many jail suicide cases and I'm sure that there's probably some examples similar to this out there, but I have never heard of an inmate who has committed suicide in this manner. He was not hanging at any point in time. So when he was found, he had used his pants to strangle himself and he was kneeling at his bunk with his head at the head of his bunk as if he was praying or reading. And I think it goes to show how unusual this was that when they did the rounds and discovered him, the officer who actually came to his door and looked through that cell window, he needed to get Mr. Wallnau's attention to verbally respond as is required at the end of the day for head count. He didn't think anything was amiss. He looked in, saw him, thought, oh, he's kneeling at the head of his bed. Hey, Mr. Wallnau, checking on you. Mr. Wallnau doesn't respond. It's only then, even at that close proximity, where there's nothing blocking his view, that he realizes, oh, it looks like there's something around his neck maybe. So the issue with the bunk coverings, there's absolutely no evidence in the record that that covered or blocked in any way any meaningful view into the cell that would have in any way prevented either the pod officer who was there in the bubble sort of watching all the cameras or anybody walking by doing physical roving checks that they didn't see it because of the cell covering. It's just kind of a non-issue really. Hold on. Hold on. I don't know about that. I mean, you're saying that from the, if the, that the putting the, what was it, a bed sheet or something? It was a bed sheet at the end of his bunk. That that didn't prevent the person at the G-block headquarters or whatever it's called, the monitoring unit, from seeing that he was putting something around his neck? It didn't. You could still see the head of the bed. And so when the sergeant walked by and looked into this cell door, you know, presumably a foot away from the glass in the door, he's still at that close angle and clearly no bed sheet blocking his view. He could not tell that Mr. Wallnau had strangled himself and was no longer alive. But the other officers couldn't see the head of the bed who were monitoring him on the video, correct? You could see the head of the bed on the video. You could see the legs. You could see the bottom of the bunk. So if somebody had been sitting on the bunk, you could have seen his knees and legs. So they could see, because it looked like he was kneeling, they could see his position. It looked like he was, they couldn't see his head, but they looked as though he was holding a book or praying at his bed. In all the cases that I've read, and we've already mentioned Jump and some other ones have come up, and all of them in the brief, the one other thing that I noticed is that I think we often assume that every single person who is suicidal is going to show some obvious or outward signs that they're suicidal. And it's those signs that the Constitution would require corrections officers to recognize because it would be reasonable for them to interpret those things as indicating self-harm. In this case, I think we're all probably aware of an example, but of someone who sort of flies under the radar and has no outward signs. But certainly he did to his probation officer. He did to his probation officer. There's no dispute about that. What he said to Agent Bunce was alarming, to say the least. And after the fact, the wealth of information about this gentleman that came to the jail after the fact was very startling. And no doubt they would have handled things much differently. Had the arresting agency given them any indication? Had the family said anything? Had the officers been present during the interview with Agent Bunce? But none of that happened. And they had no access to his criminal charges other than just, it's a probation hold. Nothing was updated on CCAB. There was nothing that they knew, and there was no source of information they could have even gone to to learn that information. And so in this case, when you get a call that an inmate is acting kind of weird, you keep an eye on him, 48 hours go by, upwards of 40 different checks are performed on him, and no one sees any kind of unusual behavior. There's simply no reason that any reasonable officer would consider him at any kind of risk of serious self-harm. Even if we assume that on July 6th, when Agent Bunce called, the jail immediately put him on suicide watch and kept him there for 24 hours, and a mental health professional came and said, are you feeling okay? Are you doing okay? He was asked those same questions when he was booked into the jail 24 hours before, and he said, no, I'm not suicidal. I have no mental health history. I'm not on any medications, and I never have been. There is no indication that he would have stayed on suicide watch more than a few hours, been released, and still gotten back to his cell and been able to commit suicide. He is sort of the quintessential example of someone who is private, keeps those concerns to himself, is not crying, is not showing what officers would normally expect to see in this kind of situation. There's no training that could have ever given them insight into this type of behavior. They had no reason to doubt what he told them at booking, especially after he acted in a completely normal and rational way for the next four days. I think Hays' Law is squarely on point. It's already pretty much established that in a situation like this, and in situations with far more serious facts, it would just be extremely unreasonable to expect officers to take the most If anybody has any questions, I'm happy to answer them. Thank you, Counsel. Thank you very much. Anything further, Counsel? Yes, thank you, Your Honor. Opposing Counsel, well, first of all, let me say I also understand that corrections officers have very hard jobs, but that doesn't absolve them of their constitutional responsibilities. Opposing Counsel mentioned training, and I do think that's important, because Sergeant Kolinsky testified that if she had been told about the fact that Gavin Walma was hitting himself, that she would have made sure that he was seen by a health care provider promptly and put in observation until that happened. Opposing Counsel also mentioned that there was no reason to think that Gavin Walma would have responded any differently after booking than if he had been confronted by a health care provider or an officer. Well, that's not exactly true, because that person would have been able to confront him with Probation Agent Bunt's allegations. That would have likely prompted the kind of response she prompted from him when she asked him the questions. I think that's a fair inference to draw, and that should be up to a jury to decide. There were a lot of talk about how many times he had been observed, and again, I want to emphasize the fact that those observations are so different from what Agent Bunt's experience should have prompted an exam, not make it more excuse to be overlooked. But nobody talked to him. Nobody did the simple thing to say to him, hey, we hear from Agent Bunt that you had this terrible episode. It would have been that simple to get additional facts that could have confirmed or refuted the appearance that he was suffering from a serious mental illness.  It's a COVID test. If I go in for a hangnail, I don't expect to get evaluated for appendicitis. It's a similar thing. The thing is, though, that she may have been able to evaluate him for psychological issues if Sergeant Holinsky had passed on the information that she got from Ms. Rudolph. The district court was correct when it found that the covering over the cell door did block the view of the part of the bed from the pod that would have showed that Gavin Womow was strangling himself to death. The fact that he could be viewed twice and not detected as being either dead or close to it is even more proof that the practice of letting those obstructions hang there is a cause of the death. There's another thing, too. Circumstantially, Gavin Womow put the covering over his bed and then killed himself. He thought that he had to hide himself from view if he were going to be able to attempt to kill himself, and sadly, he was correct. I'm happy to answer any other questions, but I have addressed my rebuttal issues. Thank you very much, Counsel. The case is taken under advisement.